May it please the Court, Anna Moen on behalf of the United States. The Procurement Act authorizes the President to prescribe policies and directives that he considers necessary to establish an economical and efficient system for procurement. The executive order challenged here was a straightforward exercise of that authority in that it directed executive departments and agencies to contract only with businesses that agreed to comply with certain COVID-19 safety guidelines. That use of the President's Procurement Act authority was consistent with the text of the statute and tradition, decades-long tradition, among presidents of past administration, courts of appeals, and Congress in repeatedly reenacting the Procurement Act. The District Court nonetheless enjoined the executive order, concluding that there was not a close enough nexus here to the statute's goals of economy and efficiency, but the nexus here is quite straightforward. The President made a determination based on a once-in-a-century pandemic, a highly transmissible and virulent disease that was causing immediate and acute impacts on the performance of federal contracts, determined that vaccination was the most effective means of stopping transmission and serious illness among federal contract workers from that disease, and determined that that vaccination, in turn, would save the government costs in terms of direct costs of leave, as well as indirect costs in terms of performance delays and lower performance quality on federal contracts. Well, Counsel, a lot of the dispute in this case seems to be on, can the statute that's being cited here support the delegation of that authority to the executive, and the cases that have looked at it, the analysis and the decision below, seems to provide some food for thought that perhaps this is a bit of a stretch for the authority of a Procurement Act to become the power to tell states and other government contractors the type of restriction that's being placed here on requiring health decisions by their employees. Your Honor, this use of the Procurement Act authority is consistent with the text of the statute, which says, Section 1- Has it been done before specifically to require inoculations for vaccines or similar personal medical decisions? Your Honor, I'm not aware of a prior example of this authority being used to require vaccination. That said, there is a seven decades long tradition among past Presidents and Courts of Appeals of using this authority to, in a broad way, to establish policies for contractors that improve the economy and efficiency of the performance of those contracts. Well, what's kind of the limiting of the authority that's granted here? It seems quite open-ended if it can reach this far without more express authority. Your Honor, the Courts of Appeals applying this test for decades have recognized that the economy and efficiency test that requires a close nexus to those goals is a meaningful constraint on the President's power, and I think plaintiffs agree with that here. The District Court was concerned that if this order is affirmed, it would somehow permit Presidents in the future to enact virtually any order that touched on the general health of the contractor workforce, and there's just no basis for concluding that affirming this order here would lead to those orders. I think, importantly, the context for this order was a once-in-a-century pandemic, a highly transmissible and virulent disease that was causing immediate and acute impacts on the performance of federal contracts. That is far different from any sort of generalized, latent health issue that the federal contract workforce might have that could, in some speculative way, eventually affect the performance of federal contracts. So there's just no basis for concluding that affirming this order in this particular context would lead to all of those other orders. And similarly, I think important to note is that there have been health issues in this country for a long time, and we've not seen the President issue these kinds of orders that are targeted to the general health of the contractor workforce, which I think is good evidence that that economy and efficiency test that has been used by courts of appeals across the country for decades is an effective limit, an effective constraint on the President's power. Are you challenging the district court's standing conclusions? Your Honor, we're not challenging the district court's standing conclusion on appeal. One last question. I'll be quiet. What, if any, effect is the President's declaration that the pandemic's over? Does that have on this case? Your Honor, this court is considering a judgment that was made in September 2021, the fall of 2021. That policy has been frozen in time. It's been subject to a nationwide injunction since the winter of last year. To the extent this court believes that changed circumstances, the evolution of the disease and new variants may have undermined a portion of the original rationale for the executive order, this court could affirm the executive order in the main and remand to the district court to conduct that analysis in the first instance. But I would just point out that the CDC has recently confirmed that vaccination is still highly protective against serious illness among federal contract workers. So there's still an economy and efficiency nexus here. Could I follow up on the, when you said conduct that analysis, what were you referring to if you said we could affirm on the whole and then remand to the district court? Could you just flesh that out a little bit for me, for what you mean? Sure, Your Honor. To the extent that the CDC has recently announced, as my friends on the other side noted in a 28-J letter, that vaccines are no longer as effective against transmission and symptomatic infection, this court could remand for the district court to consider in the first instance whether that might justify a more tailored injunction to the scope of the executive order. Thank you. Counsel, I wanted to ask you about your statement that the executive order was consistent not only with tradition but also the text of the statute. And I'd like to have you comment on Section 121A and whether or not that section limits the President's power to carrying out Subtitle 1 of Title 40 and policies consistent with  Thank you, Your Honor. Section 121A says the President's authorized to prescribe policies and directives that carry out this subtitle, as you mentioned. A provision within that subtitle is Section 1, which is the purpose statement, which says that the purpose of the Procurement Act is to establish an economical and efficient system for procuring and supplying goods and services. So it's fully consistent with sort of standard rules of statutory interpretation to use a definitional provision to inform the meaning of an operative grant of authority. And that is all that we're asking the Court to do here, consistent with what Courts of Appeals have done for decades. I would also just add that everyone understood this Section 121 in particular to be a grant of authority to the President, and it would be particularly anomalous to interpret that as somehow limiting or caboting the President's authority given the President has some inherent authority in this area. Or the grant can be limited in scope or broad in scope, can it? That's correct, Your Honor, and we just believe that this is a case where the grant is understood to be broad in scope because both that text is quite broad, and then also the inherent authority the President already has to manage the affairs of the executive branch. And I would just note that recently some decisions from other Courts of Appeals have sort of broken with this long seven decades' worth tradition of interpreting this statute. We had an opinion from Judge Grant in the Eleventh Circuit. I'll just note that that opinion was, the statutory interpretation portion of that opinion was only joined by Judge Grant. But Judge Grant suggested that this Section 121 grant of authority was more narrow, and that it only empowered the President to help agencies carry out their specific listed authorities within the Procurement Act. And we think that interpretation is just inconsistent with canons of statutory interpretation, which tell us that long-standing presidential practice, long-standing interpretations from Courts of Appeals are meaningful in thinking about what the text of a statute means, and that particularly Congress's reenactment of the same exact substantive provisions in the wake of that consensus as to the meaning of the statute is assumed to carry forward the interpretation. So think that there is no basis for similarly breaking from that trend in the way that Judge Grant did in the recent Georgia v. President of the United States opinion. You've described this sort of as a shift in how we interpret, how courts are interpreting the statute, what's the scope. In your view, I guess I'm having a little trouble understanding what the new standard would be. We've got sort of, as you said, some case law that has established this economic and efficiency sort of standard with this nexus. If that is pushed aside, what sort of limits do you see then on the executive authority under this statute? I don't know if my question is making sense, but I'm trying to figure out if the courts consistently are changing how we view this statute, what is a practical matter? Will that mean for executive authority? Your Honor, as a practical matter, I think that would mean that every single executive order that we've seen issued pursuant to this power for the past 70 years would be called into question. So it would call, we had an opinion from a state panel in Kentucky that also said that these exercises of authority could only be sort of internal facing, could have no impacts on how federal contractors perform their work. And that would call into question the anti-discrimination orders that were issued by three different presidents in the 1950s and 60s. It would call into question the price and wage increase orders that were issued by President Carter in the 1970s. It would call into question labor rights and immigration orders that were issued by Presidents Clinton and Bush in the 1990s. So what would the authority then, and I appreciate that answer, what then would the scope of the authority look like in your view if we were to adopt a variation of what Ms. Urey is arguing here? Can you help me sort of understand then what the Procurement Act would be doing in terms of granting the executive the authority to direct these agencies to do what? Your Honor, I'm not quite sure and I think that might be a good question for my friends on the other side, but I would just point out, I understand Missouri's argument here to be a focus on this word system in Section 101 of the statute and a suggestion that because a system is somehow related to the government's internal operations, the President can only go outside effect but only kind of govern the ministerial internal operations involved in contracting, but I don't even think under that reading of the statute that it supports a limitation on the President's authority that my friends on the other side are suggesting because I think any speaker of ordinary English thinking about the word system and creating an economical and efficient system would think if I create a rule of decision that says here's a way that I'm going to find the most economical and efficient contracts to enter into, and my rule is that I'm only going to enter into contracts, for example, with suppliers who have a past history of performing on time or delivering high quality work, I think anyone would understand that to be establishing an economical and efficient system for procurement. So, Your Honor, I think under its extreme form, what my friends on the other side would suggest or are suggesting is that this is just a purely ministerial power that doesn't really differ from anything the President already had internal authority to do in terms of managing the executive branch, and I just think that that reading isn't necessarily supported even under their own view of the text, but then also would be extremely problematic insofar as it would conflict with this decades-long tradition among Presidents, Courts of Appeals, and Congress in reenacting this statute in the wake of that consensus. Well, given the waning of the emergency from the time, why is it so vital that this preliminary injunction be removed? You will still be able to proceed with the litigation that's underway? Your Honor, yes. The litigation will proceed underway and there were a number of questions that the District Court reserved that it will need to address on remand. This litigation is extremely important as a general matter to the President and the government because this Procurement Act of the... There's nothing going to stop it? The litigation's able to proceed? Yes, the litigation is able to proceed, but I think importantly, to the extent that there's any sort of question of whether the judgment should change in the wake of the evolution of the disease and new variants, that's something that it's been sort of uncertain whether OMB can even make a determination since it's been subject to this nationwide injunction in Georgia and then also the injunction in this case. So that is why we would want the preliminary injunction vacated. And I see I'm entering my rebuttal time. Unless there are any further questions, I'll reserve the remainder of my time for rebuttal. Thank you, Ms. Mullen. Thank you, Your Honor. Mr. Tallent? Good morning, Your Honors. May it please the Court, Michael Tallent representing the State Appellees here. I'm going to start with the big issue before this case, the one discussed, my friend discussed, which is whether the Procurement Act authorizes the contractor mandate. The analysis here proceeds on two paths, I think, presaged by what my friend discussed. The first is discussing the meaning of the Procurement Act, which shows that the Procurement Act is really about how the government contracts, not how contractors perform. The second part is that close nexus test. And I think, actually, at the end of the day, especially in this case, the analysis of the two kind of overlap a little bit. There's some harmony between the two. But the analysis of both leads to the conclusion that the Sixth and Eleventh Circuits reached, which is that the contractor mandate is not authorized by the Procurement Act. And looming large over this, and something that this Court discussed with my friend on the other side, so the Court is very much aware about this, is a limit, or I guess the lack of limit, in the government's reading of the Act. Briefly, kind of to summarize, the government says the contractor mandate is authorized by the Procurement Act by stitching together two provisions, Section 101 and Section 121. Kind of paraphrasing from pages two to three of their opening brief, what the government says is that those provisions taken together empower the President to issue any policy or directive he believes is necessary to promote economy and efficiency in Federal contracts. Well, that's not a principle with a limit, or that's not a power with a principled limit to it. And to be sure, my friend on the other side says, well, economy and efficiency is a limit, but that's really more of a tautology, especially when added to the fact that the government asked this Court to defer to the President's judgment of what constitutes efficiency. So we're really in a situation, I think, Chief Judge Smith, you pointed out, Judge Gross, you pointed out, where we're dealing with a case where there's no principled limit to what the government, what the President may do under the Procurement Act, something the District Court and the 6th and 11th Circuit noted. Just take the logic of the contractor mandate in this case. Counsel, I asked your opposing counsel the question about, well, what about the language of Section 121A? And I think the government's position is, well, the purpose of the statute is included in that language, and therefore, there's no contradiction between the limitations in the Section 121 and the broader purpose of the statute. How did you respond to that? Well, I think what my friend on the other side said, and I think the 6th and 11th Circuits have said in this context, is that Section 101 as a purpose statute is a guide to interpretation. It's not a substantive brand of authority. So in Section 121A, when the statute references the ability for the President to issue policies and directives necessary to carry out this subtitle, this subtitle does not encompass that purpose statement. The Georgia Court, the 11th Circuit, was very clear about this. That's not a grand substantive authority, citing this Circuit's decision in independent Meatpacker's Association v. Fox. So I think the way the purpose statute works with 121A is it helps inform that second sentence in 121A, that the policies and directives cannot be inconsistent with this subtitle. So economy and efficiency, and this is where the 11th Circuit went with this, helps understand whether a particular policy or directive is inconsistent. So whether it's limiting the amount of suppliers or limiting the number of people who can compete for a bid, for example, that's where 101A comes in. And that's just on the textual side of things. Within the text, and I think it's important to note why the purpose statute in this context specifically cannot be a grant of substantive authority. This gets to the limit argument I pointed out. As the district court noted, you know, just kind of looking at the contractor mandate specifically, there's no really limit to what the president can mandate an employer to do. So for example, the government argues that the contractor mandate promotes efficiency because it will prevent people in the workforce from becoming ill, getting sick. They'll stay healthy. Instead, they'll stay healthy. They'll be at work instead of at home sick. Well, the district court noted, the 6th and the 11th Circuits, I think, also noted this. Under that logic, the president could issue any type of health order he wants. I have a follow-up on that. I feel like we've sort of slipped into this parade of horribles and without sort of sticking to what this is. And I'd like to just kind of engage with you a little bit about this because it was a pandemic where it was just different than just getting sick, right? Anytime. And I appreciate your point that, you know, when anybody's absent from work, a contract may indeed be slowed down. But do you not think that there's enough of the record? I mean, putting aside sort of bigger senses of authority, but this idea that the pandemic meant that entire groups of people had to stay away from a work site whether or not they actually had COVID because of exposure, that we're in a different sort of situation when it comes to absenteeism. Can you address that for me as to why maybe that may not be the slippery slope parade of horribles that you're concerned about? Well, I think there's encompassed, I think, within that position, I think, two arguments. One is something my friend on the other side pointed out, which is, and I think this is where you're getting at, the president's never used this to issue a health order before. I think that's where you're going with that. I guess I'm just trying to say, you know, let's give you the point of, yes, okay, just because people get colds and sometimes in this work, but that may not be something that the president can put into contracts under the Procurement Act because it doesn't sufficiently promote economy and efficiency. But that this idea that we're equating sort of regular sickness and absenteeism based on what we have traditionally known as being, I'm sick, I can't come to work with a pandemic where we're talking about something highly contagious that basically, based on the last argument, we're talking about stay at home orders and quarantining, whatever that word may mean. And I guess I'm trying to, I'm trying not to conflate those. I'm trying to see whether you can talk to me about those two separate sorts of situations and not combine them as one, because I just don't see those as the same thing. I understand where you're coming from. I think in this context, if you look at what the Supreme Court said in Alabama Association of Realtors, in the OSHA vaccine mandate case, you actually can't separate the two. The underlying power has to be logically consistent and kind of with the COVID context. So even in the context of COVID-19, even in the context of ensuring people don't get the disease, and I don't think anyone here is saying it's, we should, we should ignore the fact that there was a pandemic happening. But I think if you look at what the Supreme Court has said, the underlying authority still has to be there. And so the slippery slope argument actually does matter in this context, Your Honor. When the, as the Sixth Circuit said, the government hasn't really grappled with the logical limits, if there are any limits, to what the government, what it can do under its reading of the Procurement Act. So it can mandate, if we abstract away from the, from the COVID-19 context, and it can mandate, for example, any order that would promote the health of the workforce. So eating vegetables, going for a walk. I know these are very different than the COVID. But wouldn't they have to show that that improved the economy and efficiency of government contracting in some sort of way that was beyond negligible sort of statistically and really looking at data? Would there not be a requirement there before the executive could do that? The government's argument, the government's argument here is that anything in the President's judgment that he considers necessary to promote economy and efficiency is fair game. So that would include anything that would promote the health of the workforce, as a district court noted, as a Sixth Circuit noted, as the Eleventh Circuit noted. It can go further than that. It can go to things like lunchtime breaks, how many hours people are at lunch. It could go to things like how many, how, how personal cell phone use in the workplace. That's the problem with the government's argument here. They are interpreting the Procurement Act as a directive to allow the President to run a contractor's workplace in lieu of running how the government contracts. And just to kind of bolster that, I'll point out that's the example that they used. The OMB November determination, the examples they use in their brief is not an example of a, of a, of a private company entering into a contract and requiring the counterparty to have a vaccine mandate in place. What they point to is a company dictating to its own workforce that they need to have a vaccine mandate in place. So what the government is... Do you, do you agree with opposing counsel that, um, that your position would in effect mean that the previous executive orders that have come before courts of appeals and maybe a district court, whether it deals with anti-discrimination or wage an hour, labor issues, is it your position that those, if they were to be in front of us today, those would go down as well with this, as, as, as you are arguing this one should? I don't, I don't think that necessarily follows. I think this is... Why not? Well, this is a context in which, going again to the 6th and 11th circuits, we're dealing with a context where the major questions doctrine applies. So there needs to be a clear textual statement in the Act itself pointing to or allowing for this type of wide-ranging, broad public health order. The 6th circuit distinguished all those cases. I think it's a very good principle distinction by pointing out that all the other past executive orders do have an anchor in the workplace. So they deal with labor management, for example. I think that's the ordinary practice of hiring, firing, and management of labor is how the Kentucky v. Biden court, the 6th circuit, addressed it. That would be consistent with the cons, AFL-CIO v. cons court analysis of what the Procurement Act deals with, which is price, quality, suitability, and availability of goods and services. This is a vaccine mandate, unlike all those other cases. And as the 11th circuit... He said the hiring and firing. And I'm sorry, I'm just really trying to get a distinction here because one of those said you can only hire people who have been vaccinated. Well, I think dealing with the government in that context is, I mean, that's still sneaking in a public health order into the Procurement Act, right? Whether or not we're dealing... There's no principle limit to the idea that the President can mandate the economic and efficient running of a workplace just because the business is doing, is contracting with the federal government. And this is a major questions doctrine. That, I think, is a complete answer to the concern about the other prior orders. A COVID-19 vaccine mandate is different in kind, and this is what the 11th circuit noted and the Supreme Court noted in the OSHA vaccine mandate case. A COVID-19 vaccine mandate is not an everyday exercise of federal power. What it is is something different. It's not something anchored to the workplace. It's something that can't be undone at the end of the day. So kind of from a practical standpoint, looking at, I think, the West Virginia analytical framework for the major questions doctrine, which the Supreme Court recently issued, as well as analogizing this or looking to the facts of the OSHA vaccine mandate case, we're dealing with a situation where all the other exercises of the Procurement Act power dealt with things that happened in the workplace, dealt with things that were at least had some much more colorable nexus to the existence of a federal contract, how the government entered into that contract. This, on the other hand, turns the existence of a, this, on the other hand, requires workers to, contractors, pardon me, to impose a public health mandate on those who are, who are working for it. This is not a power that's been used before. And, in fact, I think the, my friend on the other side conceded that. She said there's never been a public health order in the district court. They actually stipulated to the fact that there's never been, been a vaccine mandate. I know, you know, going again to the fact that there are other communicable diseases. I think, Judge Smith, you may have asked this question. There's, that cause worker absenteeism, seasonal flu, for example, that could be addressed by a vaccine mandate. I think that absence actually is significant here. It's a reason why the, why the major questions doctrine should apply under that kind of West Virginia rubric. Looking at the... Can you give me some examples going forward? If we were to rule in your favor, what is the scope and how do we determine the scope of the executive power under the Procurement Act? What does it look like going forward in your view? Well, it's just a textual analysis. The policies and directives necessary to cut, to, to carry out this subtitle as the 11th Circuit noted. And that's not an insignificant power. The 100 different sections of the United States Code. Federal contracting is not going to collapse just because the President can't mandate a vaccine for everyone who may be working with a company who is doing business with the federal government. Can you give me some examples? As I know, give me some examples going forward. What is within the executive power? Well, I think an example would be if, I think a good example would be if someone is doing business in, or wants to contract for a sensitive national security concern, the President could issue a policy and directive saying that the Department of Defense has to require them to have up-to-date computer security systems. And the 11th Circuit, I think it's, it's, it's a little tricky on this point because that power is really done, I think, on a case-by-case and project-by-project basis. And there's, there's examples of how that would look in terms of litigation from the 3rd Circuit and the 4th Circuit in the Associated Contractors case and the Liberty Mutual case. These cases deal with the anti-discrimination orders. We're touching a little bit on that close nexus analysis. In both cases, there was a, the courts noted in the specific application of the anti-discrimination orders in that context, the 3rd Circuit noted in Associated Contractors that the order itself was directed at construction contracts and that the construction contracts had a unique, the anti-discrimination provision there had a unique link to federal contracting because there was evidence in the record that it would reduce cost for the federal government. The 4th Circuit, by contrast, in the, in the Liberty Mutual case, noted that such record evidence was nonexistent. So we're, in that case, there's, there's a much closer, there's a much closer kind of project-by-project or category of contracting, category of contracting analysis to, to, to the Procurement Act order. That would be consistent, I think, with how, for example, 41 U.S.C. 3306 deals with solicitation bids, which looks kind of on a, a, allows some flexibility to agencies to draft the solicitation in order to meet the, the mission of the agency in seeking out that contract. And again, I think, at the end of the day, we're, we're litigating this, that's a nexus analysis, but we're litigating both within the shadow of the government's claim of power here, which is that the President can mandate anything he believes would promote efficiency and economy in the workplace of a, of a contractor-employer. And it's, it has to be, in this case, I, I would point out, going to the COVID vaccine, COVID context, it, the government is expressly asking for this Court's deference. Because the government has conceded in, in this Court that the vaccines do not prevent transmission. And in fact, they stipulated in the district court, going back to the early days of this litigation, that they didn't know that the vaccine prevented transmission. Yet, preventing transmission was a basis of the OMB's determination here. So this is a, this is truly an unlimited claim of power by the government, whether you look at it how they present the standard, which is deference to the President's economy and efficiency judgment, or, and whether how, and looking at the facts in this case here, which the facts in the record do not support the actual economy and efficiency link that the government says exists. Counsel, the government also argues that the scope of the injunction is too broad. Why shouldn't this injunction be limited to the states that are parties to the litigation and in their role as federal contractors? So on, on that front, I think the, the answer is the district court's Parents Patria analysis ignored the fact that the states all have a quasi-sovereign interest in the, in the health and economic well-being of their citizens. The Sixth Circuit Kentucky case discusses this in some depth, I think, in some depth, very thoroughly and persuasively, that the, the public health interest in and of itself gives all the states both standing and an injury here, because a contractor mandate is an intrusion into that fact, which circles back again, kind of, to that common sense major question. But here the district court found that the, there was no Parents Patria standing. Right. And, and we contest that, that fact based on that. So we would have to, well, I disagree with that. Well, I think the... Did you cross-appeal the, the finding on standing? We did not, because the district court's injunction, the district court didn't hold no state had standing. What the district court said is there's at least one state withstanding so it could review it. And then it said there was no Parents Patria interest involved. The injunction currently covers all ten states, so we couldn't cross-appeal that. That was the, that was our request from the district court, so that we weren't injured by this order at all. We're defending that this is a defense on an alternative basis of the district court's So we, in this case, we, we have the Parents Patria interest. I also think there's a practical concern here. This is, I think, reflected in the Eleventh Circuit's decision. The idea that the states could be disadvantaged in their role as contractors if there wasn't a wide-ranging kind of prohibition in the injunction. The states, the federal government could slip in the contractor mandate without really doing so by placing a lot of weight on it if those states were contracting against someone with a vaccine mandate. But I think the, the, the Parents Patria interest, I think that's a good, good jump off again to touch on, I think, the major questions doctrine in, in this context. The Sixth Circuit noted and, and that public health is an area traditionally left with the states. That's a, that's again kind of another reason why the major questions doctrine should apply in West Virginia VEPA. I think it's a, it's another good argument for pointing out that because public health is traditionally left with the states, this is not something that the federal government typically does. The federal government typically does not dictate public health orders to those who do business with the, with the, with the government in their role as contractors. So wasn't there some tension in this case between the major questions doctrine and its application on the one hand and the close nexus to the purpose on the other hand? I think if you, if the, I think in this case there's not necessarily that tension because in this case you do have the government saying because this promotes, because the COVID vaccine mandate promotes public health and we can issue any public health order that improves the health of the workforce, you don't have that tension. This order in particular is clearly a major question. Well, I'm just wondering if the close nexus to the purpose is the proper analysis. Even if that is a proper analysis, I would go back to pointing out that the federal government doesn't, doesn't engage in that analysis. If you look at the seminal cases that deal with that, Kahn, AFLC, so AFLCIOV, Kahn Associated Contractors Liberty Mutual, there's a, there's a, the, those are, those follow that category by category and project by project kind of analysis that we have, that the 11th Circuit approved applying the major questions doctrine and looking at the text of the law. This is why I say there's overlap in this case between the two tests. They lead to the same place. The major questions doctrine I think puts a thumb on the scale no matter what analysis you use, given the scope of authority that the government, government claims. One quick note on, I think, history. The government, beyond just pointing out that they've never stipulated to a, they've never issued a public health order in the history of the Procurement Act, not only cuts against it, the government places a lot of weight on a number of other cases and executive orders. None of which, and the 11th Circuit and 6th Circuit deal with this, I think, very thoroughly. None of which actually say that the President has the ability to kind of run, to issue public health orders, to tell employees what they can do in order, employers what their employees must do in order to promote the public health. They've always been restrained to that. Thank you, Mr. Towne. Thank you. May it please the Court, Your Honor, I'd like to begin by discussing the major questions doctrine. There are two primary reasons why that doctrine has no application here. The first is that as cases like West Virginia versus EPA pointed out, that doctrine really applies if there's some sort of vague ancillary, or as that case called it, backwater provision of a statute that's never before been used in a way that has a broad delegation of authority. And that's just not the case that we have here. As I mentioned in my opening, this section of the statute has been used for seven decades by Presidents and upheld by Court of Appeals in using the statute to prescribe policies and directives that improve the economy and efficiency of the federal contracting system. The fact that it's never been used in this precise way before doesn't change the matter. I think the CMS case from the Supreme Court dealing with a vaccine mandate for staff of Medicare and Medicaid facilities is actually quite helpful on this point. There, the Court noted that the provision at issue had been used in broad ways before, and the Court said it doesn't matter that it's never been used in this precise way because we've never had a pandemic of this scale or scope before with these kinds of significant effects in this case on the federal contracting apparatus. I would also just note that the ways that this power was used previously are not ways that would have escaped Congress's notice. The Presidents had used the powers to address some of the most sort of politically charged and controversial issues of the day, whether it was anti-discrimination in the 1950s and 60s, inflation in the 70s, immigration in the 2000s. So I think all of those are reasons why major questions doctrine doesn't apply here. A second sort of distinction with some of the cases that my opposing counsel cited is that this is an exercise of spending power. This is not a direct regulation of private businesses in the way that the OSHA mandate that was before the Supreme Court earlier this term was. This is the President directing his agencies about how they use their purchasing power to enter into voluntary arm's-length transactions with businesses, and that's important in thinking through the scope of the delegation that Congress gave the President because Congress often speaks in broad strokes when it's delegating its spending power. I mean, we see lump sum appropriation bills all the time. And so that difference in the font of authority and the exercise of authority here is also key for concluding that the major questions doctrine doesn't apply. I also want to address the point about there not being any limit to our position. As I think the colloquy with Judge Kelly revealed, this executive order is very different from one that would just address some sort of latent general health interest in the contractor workforce. This executive order was issued in the context of a once-in-a-century pandemic that, as Judge Kelly noted, not only had serious effects in terms of making people seriously ill, hospitalizing and in many cases killing people, but it also meant that you had to oftentimes quarantine simply by virtue of being exposed to COVID-19. And that situation is very different from a sort of general interest in the health of the contractor workforce. On the textual point, I think that my opposing counsel noted that the purpose statement in Section 121, but it's not clear why if it informs the second sentence, it can't also inform the first sentence. And indeed, that's the way that courts have interpreted it for decades. Also, my opposing counsel suggested that somehow this authority, the President needs to exercise this authority in sort of a project-by-project or agency-specific way. I think that's just entirely inconsistent with the entire reason for being for the Procurement Act, which was to centralize management of the procurement system and to give the President a direct and active role in supervising this system. So I would just say that the text, the decades-long tradition among past presidents, courts of appeals, all of which has been reenacted, all of which Congress has been aware of and reenacted the statute, informed that this was an appropriate exercise of the President's function. Thank you, Your Honors. Thank you, Ms. Mullen. Thank you also, Mr. Talbot. The Court appreciates both counsel's participation and argument before the Court this morning.